Thank you and thank you for having us back. David Berman with my colleague Noah Purcell for the Yellow Pages Publishers. I'd like to reserve eight minutes if I could, largely because the standard now is different than it was when we were here before. It is de novo review, the burden is on the city to justify under either the core First Amendment test or the commercial speech test, and then the burden is on the city under the summary judgment standard as to disputed facts, such as the existence of other unsolicited publications in Seattle or the amount of paper that's recycled or that the city council thought was recycled from erroneously delivered books. So I'd like to just, if I could, speak briefly to the question of full First Amendment protection, because that was something that was addressed at some length before and obviously in the briefs. And as you know, our position is that it is undisputed here that this is a different situation than the cases that the city and the district court relied upon. First, it's undisputed here that the publications at issue do more than propose commercial transactions. Our expert witness is unrebutted on the value provided by the listings and the community information. The state of Washington has required the listings to be distributed to people because they view it as important, and the Supreme Court in a number of cases has emphasized not just the community information and the importance of that, but that even commercial information has important First Amendment values. The Supreme Court in the Greater New Orleans Broadcasting case, for example, pointed out that combining in one place information and advertisements about competitors, quote, can benefit consumers or can benefit listeners by informing their competition. So this, obviously the First Amendment goes beyond the sort of poor heart and soul information that the city would like to say is where it stops. And the commercial speech doctrine, we believe, does not apply in this situation. Second distinguishing factor is the fact that the publishers here are not selling the items advertised. The third is that the ad for the district court seemed unusually irate on that I apologize if I overstated things to the district court, but I think we all realize that the purpose of yellow pages is not to advertise free yellow pages. That would be circular. Clearly there are some ads in yellow pages. They are often used as filler, but obviously people do put ads for themselves in publications they have. But that's not the essence of yellow pages. And if the city wants to emphasize the essence of publications, they have to admit that here the purpose is not to sell yellow pages. The advertisers that do have the ads, which are the vast bulk of the ads, do not control the noncommercial content. The listings, the community information is controlled by the publishers. And fourth, here the noncommercial content was not added to immunize, as the Supreme Court was concerned about in the Bolger case, to immunize what really is an ad and was admitted in Bolger to be an ad. Here that information came first. The ads were added later to defray the cost, and in that sense, as we've pointed out, are inextricably intertwined, or at least as the Supreme Court said, characteristically intertwined. They are necessary to support the information that does have First Amendment value. Senator Kerr, I recall reading, and I just want to be sure my recollection is correct, that actually your client essentially pays, paid the state for the right to do this, and each person who has a telephone, I presume, a, yeah, a telephone. It's a landline. Right. Benefits by, I think it was a hundred million dollars a year, and that would go to reduced rates. It's not that much, but it's many millions of dollars. It was spread over a number of years going some years into the future, and that money has been contributed on the assumption, the assumption under state law, that advertisements would remain to defray that for many years into the future. No Supreme Court case, no Ninth Circuit case, applies commercial speech doctrine under these facts. And the two of them. This is a tough situation because it seems to fall between cases. So I accept your proposition, but there's the converse proposition. We don't have any authority that speaks quite to this set of facts either. So what authority do you think comes closest to these facts? I think the two cases that come closest are the Hayes County Guardian case from the Fifth Circuit and the Ad World case from the Third Circuit. In both of those cases, you have three publications. One was a shopper, one was a free newspaper filled with ads. And the courts, one before Bolger admittedly, but one after Bolger, Hayes County, found that the full First Amendment protection applied. And the Hayes County case is cited affirmatively by this Court in the SOC v. Clark County case, another commercial speech case, and one in which the Court seemed to approve of at least the language in the Hayes County case. In the Ad World case, it really gets to the essence of what's happening here. The Court pointed out, it was something called the piggyback shopper, that there's been a time-honored method of distribution of free speech, which is door-to-door distribution. And that if someone, if there is a burden on your privacy, you put out a sign saying no trespassing. And if people violate that, then the government can step in, but it's no big burden on you to put that sign there. And historically, we have all assumed that people can come up to our threshold and leave something there. The standard that the district court and the city grapple and the amici, even, I think, worse, grapple so hard to come up with to justify this case simply does not provide any limiting principle. They cannot, in any intellectually honest fashion, tell you how the test that they would apply would not reach much core First Amendment activity, such as newspapers. And the tests that they come up with always basically hide some sort of content discrimination. The essence of what the First Amendment is often concerned with shouldn't be turned around and made into part of the First Amendment case. Well, the Court has said that, using billboards as the example, this is a billboards case. And there's a body of law applicable to billboards, not divorced from other medium of expression, but this is a billboard case. Is there a categorical approach suggested there so that you can say, this is a directories or even yellow pages case, so that, generically, we treat it differently than we treat the category that's called newspapers and the category that's called billboards and so forth? Well, billboards, we believe, are explained in a couple of ways. One is the fact that it is always just an ad, or it is just some sort of political ad. It can be a political ad. I mean, it can be very much a First Amendment expression if it has to do with some valid issue, something like that. And generally, those are allowed under most of those ordinances. And so we don't have cases that say that you could not have political billboards under the same full First Amendment scrutiny. Under the commercial cases, the publisher basically is acting on behalf of a single advertiser selling the product. Take a billboard. Suppose you have a billboard that, I got a billboard company. I really want to get this billboard next to the freeway exit. And so I decide to, okay, let me sell half the billboard for a purpose and have an ad for some used car dealership that's nearby. And the other half, I'm going to put up a message that's clearly a First Amendment speak to a valid issue or support a candidate or classic First Amendment speech so you have a hybrid. What happens then? You don't have the hybrid in the sense you have here because it is, as in Bolger, an attempt to immunize the commercial speech and not simply using the commercial speech to finance the non-commercial communication. That's the situation you have here. Very different than Bolger. I believe different than your situation. Suppose I'm a church. And on my church site, I want to promote the church, First Amendment in that sense. But I can't afford to put up a billboard. Somebody comes to me and says, tell you what, I'm going to pay for a billboard. You get this part of it to put up your message in God We Trust. And I get this half of it to sell for advertising space and that's how I'm going to pay for the billboard. Or a harder case, even the church goes out and solicits that in order to finance it. I think that would be a situation where the traditional full First Amendment time, place and manner test would have to be satisfied. And it often is in billboard cases because of the location may be a legitimate issue for the city to worry about. But if it truly was a situation in which a non-commercial message could not reasonably be communicated without that financial support, I think the First Amendment test, full First Amendment. Their argument essentially comes down to this is unwanted. Their argument does. It's unwanted. That's why they're, that's the whole rationale for this. And let me, if I could use that to turn to applying the commercial speech standard. Because I think that's where they also fail pretty dramatically is satisfying, making anything out of that unwanted argument. If you look at the cases that apply commercial speech, unlike the district court here, they do not ignore the fact that you might have this hybrid situation. The district court here had a binary approach to things. If it's not full First Amendment, if it's commercial speech, I don't care what happens to all that non-commercial content. He never discusses the burden on the non-commercial content. He expresses no concern about it. Compare that to cases like Bolger, which specifically says, well, we're going to apply commercial speech standard because this looks like an attempt to bootstrap in protecting these ads. But then when they apply it, they find that it does not satisfy even the commercial speech test. And they take into account the value of that non-commercial communication that was also part of some of those pamphlets in Bolger. And if you look, that happens in case after case. And part of what explains why, when the Supreme Court or this Court applies even the hybrid situation, almost inevitably, the government policy fails. If you look at Bolger, if you look at Discovery Network, if you look at Central Hudson itself, if you look at Fox, if you look at Riley, in Fox it was just a remand, but in all of the others, in the PG&E case, in all of those cases, the court finds that it cannot satisfy. And part of the reason is that they say where you're burdening non-commercial speech, you have to have a good reason. Not just a substantial government interest, but you have to show that you materially advance that. Here, if you take their unwanted argument, what they're saying is that yellow pages and white pages are 2% of the recycling stream. Some portion of that is white pages, so we don't even know that. And most of the yellow pages are wanted. So then they have some unwanted yellow pages that are incorrectly delivered, and they say we're so concerned about that minuscule effect on the recycling stream that we are going to burden all of this non-commercial speech. That is almost exactly why the Supreme Court struck down the restriction in Bolger. It is why the Supreme Court struck down the restriction in Discovery Network, that it simply could not be justified in any sort of reasonable balancing test. In Bolger, they say it only marginally forwarded it. This case, this court in Berger, which was not applying commercial speech, it was applying time, place, and manner, but it's basically the same standard of substantial interest being furthered. It said that a limited, incremental, marginal increase in serving some substantial interest is not good enough. And that should be the test in the commercial speech area as well. And the city cannot satisfy that. The most their record before the city council shows is that there were a few hundred incorrectly distributed over a valid objection from someone. Even if they say it's 15%, which that is a disputed fact, which should entitle us to trial, because usually most of what the individuals thought were incorrectly delivered, they hadn't made a timely request, they got somebody else's book, and they thought it was the one they had opted out of. There are lots of reasons why those statistics aren't right, but that's still a minuscule amount. Since this ordinance- If you worked it out, take, pick a number, take 10%. Have you worked out what impact there would be if 10%, if you didn't deliver 10% of the directories, what's the ultimate impact? Well, the impact on the city is one-tenth of something less than 2% of the recycling stream. We don't know why that is so significant to the city. We do know this impact. The Spanish language Yellow Pages have left Seattle because of the ordinance. Super Media has left Seattle because of the ordinance and only now publishes in the suburbs. Dex has more market share, presumably, because the ordinance has burdened those others so much that they had to leave. This has been good for your client. For one of the clients, I have more than one, so I'm trying not to choose. What is it about, as a practical matter, what is it about this regimen that troubles you the most? Is it that you have to pay, how much is it, $380,000 a year, or is that what this is all? That is a significant burden, having to get a license and be subject to sort of the interim effect of the city, which, as the court indicated in Berger, is clearly a prior restraint, even if it ultimately is justified, it's a significant First Amendment burden. And having the license fee, half of it, go to advertising, trying to convince people to make the choice that they don't want this. It isn't trying to communicate to people that, oh, you already said you didn't want it, and here's how you rectify that. It is affirmatively trying to convince them that if they want to tip one way or the other, they should reject our publication, and we should not have to pay for that. But isn't the city's opt-out procedure significantly less burdensome than would be an opt-in procedure? It is, Your Honor. We would agree that it is less burdensome. In fact, they basically took the private entity that we had also been using, Catalog Choice, but they are, it is the advertising and the effort to convince people to opt-out more than the mechanism itself. What did your client pay Catalog Choice to operate its system? Catalog Choice is a non-profit that, I don't know the amount. They did make a contribution, whether it was literally a quid pro quo. I mean, arguably, you'd net out that amount to figure out what's the additional burden put on your clients by the city's system, but we don't know what that is. We don't. Another reason, if this isn't facially invalid, that it certainly can't be justified to be decided on summary judgment. One of the reasons I asked the question, and this may not be the place for it, but it struck me that this is a case that, you know, possibly ought to settle, that, you know, when I look at the burden that's really placed on you, and it seems to me that there could be a middle ground here. Is that? I'm sure there would be finger-pointing both ways, Your Honor, on whether they were, barriers were closed to our interests or we were not willing to do enough. Thank you, Your Honor. Now you can read the fine print in the elevators. Not yet. I confess I can't. Good afternoon, Your Honors. Jessica Goldman on behalf of the City of Seattle and Ray Hoffman, and I thank you personally for scheduling this hearing in this beautiful city instead of in rainy Seattle today. There's no question here that yellow pages include commercial speech and non-commercial speech. Newspapers also include commercial speech and non-commercial speech. Under binding United States Supreme Court precedent, whether hybrid speech is subject to strict scrutiny or to the intermediate scrutiny of central Hudson is determined by applying the Bolger-Fox test. The test the yellow pages companies repeatedly recite, and which was just recited to you, is not the Bolger-Fox test. The yellow pages companies have proposed an entirely new and different test, and then they conclude that their new test is not met here, and so this Court should apply strict scrutiny. What is the test you say they propose? I'm sorry, Your Honor? What is the test that you say they propose? The test that they propose has four elements. They contend that if hybrid speech has the following – only if hybrid speech has the following elements, may it be regulated as commercial speech. The speech, one, proposes a commercial transaction alone. Two, the publisher is the seller of the items advertised. Three, the advertiser selects editorial content to sell its own products. And four, funding from the ads does not defray the cost of the publication. Now, I'm not sure they propose that as a test so much as they offer those up as distinctions from the application on behalf of your client and by the district court of what you described as the proper test. Whether they offer it as a test or not, tell me what it is that you think should be applied as the standard. Your Honor, I think, and the Supreme Court has held under Bolger and Fox, that hybrid speech should be regulated as commercial speech if four elements are met. One – Four seems to be the magic number. Yeah. You got it. Okay. What's the four? And three come from Bolger and one comes from Fox. The Bolger three-element test or reference points are, one, that there are advertisements and discussions of important public issues. That gets you your hybrid speech. Two, there's a reference to specific product. Three, the publisher has an economic motivation for distributing the speech. And that's what Bolger says, distributing the speech. And four, this comes from Fox, there is no inextricable intertwining. It is – No, it seems to me that covers the Seattle Times squarely. No, Your Honor, it does not. And the reason it does not is because of both the nature of the newspaper and the inextricable intertwining of the two types of speech. Well, let's go down the four. I mean, the Seattle Times contains both ads and discussion of important public issues. Is that correct? That is correct, Your Honor. And the second one references specific products. I read the Seattle Times. The ads reference specific products. Is that correct? That's correct, Your Honor. Including ads for the Seattle Times itself. That's correct, Your Honor. And third, the publisher has an economic motive for publishing and distributing the newspaper. Is that correct? That's correct. In fact, he wouldn't distribute it if he couldn't make money. Well, that's not necessarily the case with all newspapers. Well, are there – there happen to be a couple of non-profit newspapers in the country by choice. There are a lot of non-profit newspapers by economic duress. But for the most part, publishing has been a for-profit enterprise. I mean, the New York Times is publicly traded stock, so I have to assume to comply with what they're telling their shareholders, the company's out to make money. How is it the Seattle Times is different? We're now down just to the last no inextricable relationship. And how is the Yellow Pages different from the Seattle Times? And, Your Honor, that's the issue here. Because you go through those three tests, the first three elements, and I agree that you have hybrid speech under both newspapers and Yellow Pages. But it is inextricable intertwining which rings the bell here. It is the deciding factor. How is it less – any less inextricably intertwined than it is with the newspaper? The newspaper is selling ads to finance the publication of the newspaper and to make a profit. And they're selling ads to finance the publication of the book and make a profit. What the Supreme Court and this Court has held in looking at hybrid speech where you find this combination is, can it be severed? Is there some reason dictated by law or by the very nature of the publication that requires that it be combined? So tell me how it is that Seattle Times couldn't be severed. Your Honor, we know from Hayes the Fifth Circuit decision that Mr. Berman has cited to you as the most on-point case that newspapers can't survive without the advertising that funds them. So if you take advertising out of newspapers, as you've acknowledged, you don't have newspapers in this country. Well, you disputed it about two minutes ago, but go ahead. But the notion that newspapers, for the majority of the cases in the United States, are for-profit entities that – are business entities that require a financial component and engine. If you separate those, if you separate – if you take the ads out of – So you accept the economic reality or economic need as a justification for concluding that a given publication has non-commercial and commercial elements that are inextricably intertwined? Yes, we do. So why doesn't that apply to the Yellow Pages? Well, you don't need to take that from me. You can take that from Mr. Berman. And when he was before you in July, the question was posed to him, is there any reason that the non-commercial speech and the commercial speech in Yellow Pages must – are required – some mandate of either law or of purpose must be combined? And he said no.  That is not true, Your Honor. And the reason is because they needed to – they couldn't publish a newspaper without making a profit. Exactly. If we look at the hypothetical you posed. Well, look, he says – and I assume you don't dispute it, at least for these purposes – that Azor, he pointed to two or three comparable Spanish-language entities that have stopped publishing in Seattle. If you take the profit motive out of it, they wouldn't publish this. Your Honor? And in fact, that was the reason that the State of Washington derived the benefit from this permitting quest to sell their equivalent of Dexmex to begin with. Your Honor, that case is ancient history at this point. The cases in Washington regarding defraying the costs that the phone company – that individuals pay for phone rates – that ended in 2000. No, no, I'm just putting it in context. But basically, their argument is that they wouldn't publish if they couldn't make – they wouldn't publish this book in the format that it was in if they didn't – if they couldn't make a profit. In fact, all you would have theoretically would be white pages. Your Honor, envision this. Envision yellow pages right here. And you take all of the non-commercial content out of yellow pages. That's what it used to look like. That's what it looked like, they say, for many, many, many years until it occurred to them, hey, we could make even more money. We could become an incredibly even more profitable company as the – industry as the Washington Supreme Court has recognized if we added this – this business stuff that is required of the likes. Now take a look over here at newspapers. Take the non-commercial speech out of newspapers. It doesn't look anything like a newspaper. It doesn't provide the function of a newspaper to provide editorial content, to entertain all of the high-level First Amendment purposes of a newspaper. So you see what happens when you sever the two. And in Washington State, the ancient history that is referred to you – has to do with companies that were co-opted. When Quest had a co-opted sibling corporation – that it shuffled off its directory business to with a sweetheart deal, the Washington Utilities and Transportation Commission said, oh, no, no, no, no. If you're going to sell this business, sell the business. But until you sell it to an arms-linked transaction, you're going to have to make sure that the benefit of that transaction goes to the rate payers in Washington State. That's not the case today. That is not the case. What is the case today? The case today is there is – and there is no evidence before this Court to suggest that today, when this company or these companies publish information for the LECs, that that in any way benefits the rates that are paid by LEC – by phone company – phone customers in the State of Washington. There's no evidence. The one piece of – Well, if that's true, that's a shocking dropping of the ball of the Public Utilities Commission in Washington, which tries to figure out how – I mean, telephone rates are set. I assume they're set in Washington. They're set in all the other states I know of. And they consider revenue streams. And one of the revenue streams that's considered – I mean, in Hawaii, the phone company, like Dext did, sold off its right to the Yellow Pages. And the PUC in Hawaii figured, okay, what's taken in by the phone company and used that as one of the revenue streams to consider in setting residential rates? It's kind of an unremarkable proposition. Are you telling me Washington is different from that? I am, Your Honor. I'm telling you there is no evidence whatsoever. Stop. No evidence or no – you know. Is there an absence? Is there evidence to the contrary? Because we're writing a case, a decision, not simply for Seattle, but an opinion that will apply elsewhere. Can you tell me there is affirmative evidence in the record that Washington State disregards the revenue stream from directories? Your Honor, I can tell you that there is – the decisions that have been cited to this Court deal only with the past. What I can tell you is that that is not necessarily going to the issue of inextricable intertwining. The fact that defrayal may occur, that there is defraying of costs – Well, I mean, there may be a practical impact. I mean, you may be telling me this ordinance is going to have the effect of raising telephone rates. Is that the case? And, Your Honor – Certainly, that's the suggestion given to us by Dex. And there's no proof of that. I'm not saying the opposite, but I'm certainly – but what I am pointing out to you is that there is no evidence whatsoever to suggest that there will be any impact on rates or that rates today in the State of Washington benefit from that. Isn't it a logical proposition? Your Honor, what a Utilities and Transportation Commission does is not necessarily for me to decide. I will tell you there is no evidence here of precisely what is even being paid to the – Let me try it this way. To the phone companies. Are you – If the ordinance prevails and the phone company – or the phone book company decides it becomes uneconomic, as apparently a Spanish-language company did and SuperPages did within the city, what happens to the obligation to publish a directory that still falls on the LEC, correct? Yes. It does, Your Honor. And there's not going to be any revenue coming in to offset the cost of that directory, so presumably that becomes a burden on the utility, which in turn will become a burden on the rate payer. Well, not necessarily, Your Honor. The fact that the telephone company makes less money does not necessarily or inherently translate into a utilities commission approving higher rates. And that's the deal with inextricable intertwining is it requires lack of severability. Not just that it costs more money to do business or that you make less money. Yes, but you're – They're both severable in that you can take the ads and rip it out of both documents. What you're saying is the newspapers won't publish without it and here they're just going to suffer an economic harm but they could still continue to survive and that's what makes it not inextricably intertwined. Is that your argument? Yes, even more so though. There's not even evidence that they're going to suffer any economic harm. There has been no evidence whatsoever that taking out the phone listings from the Yellow Pages, which for many, many years published simply ads, is going to impact their bottom line at all. Nothing. Nothing to suggest that. Well, wait a minute. You're charging them for the whole program. Somebody's going to take the loss. I mean, if there's not this stream of revenue from advertising, are we pretending that there's not going to be any loss? How's that going to be the case? Well, as I understood the question, it was taking away the non-commercial content. Yellow Pages is commercial speech. That's what they do. They're not talking about taking away the commercial speech. The question is taking away the non-commercial speech. But in a newspaper, you've acknowledged if you take away the commercial speech, you won't have the non-commercial speech. There's no way to pay for it. How is that any different from this? Well, the difference here is that there is no evidence that they can't, which they already do. For example, in 2010, the Dex Company published White Pages in a separate book. Then it published the Yellow Pages. And that White Pages didn't contain any advertising. Was it printed for free? It was delivered for free. Was it printed for free? I mean, did the printer decide, you know, I like White Pages, so I'm going to print this up to you and give you however many copies of White Pages you need for distribution for free? Your Honor, they have not submitted any evidence to suggest what it costs. Do you think it was printed for free? I am confident that the people who published for them had to be paid for the work of doing it. So it's going to cost money to publish that directory. The fact that it costs money to publish it doesn't mean that they can't be separated. That's not the test. Well, it means at a minimum there's going to be a cost that's borne by somebody. Who do you think the somebody is? And the question of inextricable intertwining goes to whether the speech stops. Not is it more expensive, but does the speech stop as a result of the separation? And that's what the Court of the Fifth Circuit held in Hays. Is it true that the Spanish language directory is no longer published? Your Honor, there is a single-page declaration in the evidence from the Spanish language publisher that says that there are multiple reasons why it no longer publishes in Washington State. So the answer to my question is yes, it's true, but you suggest there may be other reasons. That is correct, Your Honor. In addition, there's no evidence whatsoever in the record about Supermedia. That's the first I've heard of it is before you today, that the reason that Supermedia doesn't publish in Seattle has anything to do with the ordinance or even that it doesn't publish. That's news to me. And it's certainly not in the record before the Court. I guess we're here in a hurry because their publication date was later this spring. Only maybe we're not such in a hurry anymore. That could be the case, Your Honor. I wouldn't know. Let's back up just a minute. It seems to me that the Yellow Pages and newspapers are different in some cases in that their expressive speech doesn't necessarily have a link to a specific product. Can you differentiate that? I mean, it seems to me that the speech the newspapers give, that would be called, if you will, expressive speech, which would get full protection, doesn't have any really link to a specific product. And it would seem to me that the Yellow Pages are similar. They have speech therein which is not linked to the specific product. So if I am to apply then the Bolger test and the speech does not refer to the particular product, then I would find that I would give it full protection. Well, Your Honor, I think you're correct to start with. The answer is similar if you phrase the question the way you did. Well, I can't find a way not to because I look at Bolger and it seems to me that Bolger said it's to apply to expressive and commercial speech combined to promote a specific product. In other words, we're looking at a product. I can't find where the Yellow Pages or the newspaper would refer to a particular product. So therefore, I would say they're in the same boat and I should give them full protection. Well, Your Honor, I think that the refers to a specific product that you find in Bolger is talking about a component of the speech. It doesn't say that the actual... Well, but just a minute. Bolger applied to both expressive and commercial and they said the test was to promote a specific product. In other words, hybrid speech viewed as a whole can be commercial speech if all the speech was related to a specific product or company. And therefore, I've tried to apply it in this case and I can't. Your Honor, and I don't believe that Bolger says that it applies to all of the speech. Bolger, 99% of the speech in Bolger was acknowledged as high-level speech regarding a public health issue. It mentioned in the bottom that it was sponsored by a condom company. The court didn't hold... Well, but frankly, it seemed to me that what the court did in Bolger is they said Bolger is to produce a specific product which is without doubt, in fact, the contraception, if you will. And therefore, they found that there wouldn't be any protection there. It would go rather into commercial speech. But newspapers and the telephone yellow pages aren't in that category. That's my question. That's what I want you to answer. Your Honor, I think as you phrased it, it is true. It is true that not all of the speech in either of these publications addresses the product. That is correct. I don't believe that Bolger requires that all of the speech do that rather than a component of the speech must. And that is the commercial speech part of this hybrid combination. But again, Your Honor, the issue here, the deciding factor is the inextricable intertwining component of the test that was added to Bolger. How do I read Bolger language where they found the informational pamphlets about family planning were merely created to promote a specific product? Your Honor, I think the language of the court there is hypothesizing that it might be. There was no finding that it did. But again, I think the nature of the issue there is the fact that you've got two types of speech. And in the one part, you've got this product. And in the other part, you've got what is admittedly not aimed at a product. And that's what the court says there. It says this is high-level First Amendment speech that has to do with a public health issue. And they distinguish the two types of speech that are combined. It is the fact that there is this sale or advertising of a product, in their opinion, given the reference, the one-line reference to the condom company that creates that issue and takes it out of the high-level First Amendment speech. Let me ask you another question about the reasonable fit, even if we get to commercial speech. How does the 14-cent fee equal a publisher's prorated share of the cost of the city's opt-out registry? Your Honor, there is a declaration in the evidence by the city employee who was responsible for coming up with this fee. And it's based on the number of publications, based on reporting from the 2009 year which preceded this ordinance, as to how many publications these companies deliver in Seattle, and based on a prorated share of what their share of this total cost would be for the program. But isn't some of the fee spent on advertising? Your Honor, some of the... At least half? Approximately half is spent on advising citizens of their rights. And that is... Well, if we allowed you to charge Yellow Pages Company for advertising, wouldn't this allow the city to spend anything they want on these advertisings? No, Your Honor. For purposes of the, you know, compelled speech component, it's a rational basis test. But I think that it has to be reasonable. And in this case, the ordinance itself and the regulation by the city agency indicates that at the end of the first year, they will reevaluate the cost of the program and determine if there is any basis for changing that price. It's not a profit center. And it's all transparent. And the explanation for how they got to the total price, which is then divided up among the various publishers here, is set forth in the record and provides a reasonable explanation for where this price comes to and the mechanism for changing it if it turns out that it's more expensive or less expensive after the first year. Doesn't the city specifically exempt from regulation local organizations with publications almost like these? No, Your Honor. They're different. The exceptions to the ordinance are different than the publications here before the court. The primary one is those that are going to organizations that are private membership organizations where individuals have signed up. It's part of their benefit that they've elected to get from a membership organization. And they get distributed, you know, these little quarter-of-an-inch pamphlets. Reading the record, I guess I'm having a tough time understanding why the local organizations are exempt from the regulation when this organization is not. Well, Your Honor. I mean reading the record. That's all I can read. Well, Your Honor. I'm not wanting you to get outside the record either. The ordinance itself doesn't say anything about local or non- or out-of-state or out-of-city publications. It says nothing of the kind. It says it deals with wanted and unwanted. We get back to that. Yes. And that distinction goes to whether citizens have made a conscious decision to request the information by being part of a membership organization which distinguishes that information. That gets to what this ordinance is all about. You know, you keep throwing in the city's interest in waste and the waste that's created. That would justify a nondiscriminatory tax or fee against every publication that contributes ultimately to the city's waste problem. And I suspect newspapers contribute a lot more than the Yellow Pages. As I see it, that almost borders on a pretext here. The real reason when you say unwanted is really content-based. In other words, just as the argument was made in Bolger that people are offended by the message, essentially to say that they don't want it means that they don't like it and they don't want to receive this particular message. And that's what's being vindicated here. Is that true? Your Honor, this is a regulation that promotes choice. I understand that, but I just want to get to it because I think myself reading through this is that the argument about the city's interest in the infinitesimal contribution that these books make to the collection of waste is really a pretext. And that what we're really talking about is that certain citizens did not want to get this. They don't like the content, and therefore they don't want it, and therefore the city has decided to burden this particular publication in this way. Your Honor, the exceptions to this ordinance prove that it's not content-based because the exceptions to this ordinance are publications that are tiny compared to the three-pound Yellow Pages, but they contain the same type of information. I know, but we agree that the issue is wanted and unwanted, and wanted and unwanted means that I don't like the message that I'm getting in this book, and I don't want it delivered to me. And essentially what the city of Seattle is saying is, okay, we're going to enforce a content-based regulatory program. Your Honor, the decision about content is not being made by the city. It is being made by the resident. It's being made by the resident, but the resident doesn't want it because the residents complain about it, you enact this entire scheme. It's a scheme designed to further the content-based objection of some residents of Seattle. Your Honor, citizens are allowed to make content-based distinctions. Sure they are. And that does not in any way indict this ordinance. Well, the ordinance is different. What a municipality can do is separate from what a citizen can do. Right, and the Supreme Court has held that regulatory bodies may create walls, that citizens can then push those outside them and keep them outside. Absolutely. As long as the choice is being made by the city, which distinguishes, by the resident, which distinguishes the opt-in and the opt-out programs here. So a citizen can post a no trespassing sign. Yes, and they have. And that doesn't solve the problem. That's what they did when they called the Yellow Pages companies and said don't deliver. That's a no trespassing sign. And that directive was ignored. That's where the whole problem came from, that they didn't observe those signs, those signs being. In some percentage of the cases. Even by your telling, 13 percent is the highest number. So that means in most of the cases, the vast majority, it was complied with. And, Your Honor, under intermediate scrutiny that applies here to this un-inextricably intertwined hybrid speech, it needn't be some number that is higher than that to satisfy what the Constitution requires. This court in Clear Channel in 2003 held that it was acceptable to target subsets of the type of speech that are causing the problem because those subsets are the ones that directly related to the government's purposes here. And so the fact that this ordinance doesn't deal with Yellow Pages and it doesn't deal with newspapers and it doesn't deal with any other kind of. And all of the other junk that's deposited, presumably, although you said that the only thing in the record was my statement to support the fact that all sorts of publications were being left at the door. They cited testimony in their reply brief, I think at page 12, to suggest that this was not the only unwanted, arguably unwanted or unsolicited publications that were being left at people's doorsteps. I would urge you, Your Honor, to take a look at the single paragraph that they're referring to. I did. In the record at 170. It doesn't tell you the names of the publication. It doesn't tell you where it's distributed. It doesn't tell you how many are distributed. It doesn't tell you anything about it. Is it enough to defeat a motion for summary judgment? No, it is not, because this is intermediate scrutiny. And to the degree that there are ten such publications, and we don't know that, ten such publications that are being distributed to the residents of Seattle, that is not a basis for intermediate scrutiny to fail, because it doesn't make the regulation unreasonable if some even relevant percentage of equivalent speech is not attacked by the regulation, because that's what intermediate scrutiny permits. And here we don't have any evidence whatsoever about anything about these so-called publications. I can tell you I've never received one in my home. Well, you should move to Brooklyn. I want to ask you just one more question. There are lines in two Supreme Court decisions that caught my eye. In Bolger, if I can read my own handwriting, Justice Marshall said that it is in light of the greater potential for deception or confusion in the context of certain advertising content-based restrictions on commercial speech may be warranted. In other words, it's the potential for deception or confusion in the context of advertising. And then in footnote 11 in the discovery case, Cincinnati discovery, I mean, Justice Stevens noted that the Sixth Circuit had said that the lesser status of commercial speech is relevant only when its regulation was designed to prevent false or misleading advertising or to alleviate the distinctive adverse effects of the specific speech at issue. And, Justice, the Supreme Court said in footnote 11, we leave that question open. Your Honor, I They make a similar argument, and you say there's absolutely no support for it. Well, there's support for it certainly in the language in Bolger. Your Honor I read from page 65, and the Supreme Court seems to suggest that this is an open question, at least in footnote 11 in the discovery case. Bolger specifically addressed, and I quote, commercial speech that is not false or deceptive. That's the kind of speech that was at issue there. The notion about family planning and the benefits of condom use, there was no suggestion that that information was based on protecting from deception or confusion. It was just something that bothered people from a moral perspective. If you take a look, Your Honor, at Central Hudson, the issue there in the seminal case that defines the test for intermediate scrutiny was the banning of truthful advertising. Because if you tell people too much about, encourage people to use electricity, they might actually use it, and then that will create problems of an environmental and supply chain nature that are disturbing. If you look at Florida Bar v. Wentworth, which is another commercial speech case, the issue there had nothing to do with deception or confusion, but preventing harm to the reputations of lawyers. If you look at Metro Media. Well, that falls within the category of alleviating the adverse effects of specific speech at issue, which is what the Sixth Circuit test was, and the Supreme Court said we don't have to decide it because we can strike the ordinance down on other grounds. But they suggest that it's an open question. Your Honor, with due respect, I think the many cases that are decided by the Supreme Court in which this deception-confusion issue was nowhere to be found, and whatever the explanation was for the regulation, be it morality, be it conservation, that there are many other justifications for regulating commercial speech. And again, there we're talking about commercial speech, whether it's hybrid commercial speech or it's pure commercial speech. I believe this clock is telling me that I'm way over time. We're making it work over time. Okay. But if you have something you want to tell us by way of finale, please do. Well, I would like to bring one case to the Court's attention on the issue of compelled speech. And it was a case decided by this Court the week after we met in July, and it's called Beeman v. Anthem Prescription. And in that case, this Court acknowledged that compelled speech, even where the government has a purpose or a desire to affect the outcome of what people do when they receive that information, is acceptable. The Court stated, and I quote, Most disclosure requirements, from nutritional facts on packaged foods to the financial details of publicly traded companies, are designed to remedy information asymmetries and potentially alter individuals' behavior as they become more well-informed market participants. As long as those who are compelled to disclose are not required to endorse the possible result of a better informed market, the fact that legislators may desire the resulting behavior is irrelevant. In such cases, the disclosing party is required only to provide the raw facts that others may use to make their own decisions. And with that, Your Honor, I thank you. I'll ask that the judgment of the district court be affirmed. Thank you. Mr. Berman. Your Honors, I know of no best evidence rule that says we can't rely upon the expert witness declaration that we put into the record early and that was not disputed until very late and then only by argument. Was there any motion to strike or did the district court rule anything out of order? I mean, I live downtown, so I know the realities of Seattle. I also don't think that there is any distinction that I could figure out on this inextricable intertwinement between newspapers and yellow pages. The only thing that, I mean, I think it's a reasonable inference that if you strip out all of the advertisements, that will take away the revenue necessary to support publication. I don't think we have to prove that. Well, you do have an obligation under state law. Somebody apparently has an obligation to produce a directory. Correct. And it can't be the answer to the First Amendment situation that we don't have to worry about the effect on yellow pages because the state can order them to publish, not even now that they're unconnected to the lex. I don't think she can be proposing that. Obviously, there are publications that are not as ad-based as others. The Economist or the New Yorker, people spend a fair amount of money to get and they get a few less ads. But that does not mean... The New Yorker has plenty of ads. Yeah. Plenty. Not as many as it used to, but that's not their desire. And I think it's clear that there is no rational distinction in the inextricable intertwined in this situation from newspapers. Well, you put an expert testimony that there were other publications, magazines that had a greater advertising content than the yellow pages. Well, one of the cases we cited, I believe it's in the Hayes County case, quoted from an advisor to newspapers that says your model ought to be to have 70% advertising to support your newspaper. So, obviously, there is a significant connection there, just like there is here between the need for the advertisements and getting the non-commercial speech out there. The district court applied rational relationship review, in fact, even if saying that it was intermediate scrutiny. There was no real questioning of the assertions that the city made  or the extent to which this would satisfy them. So you may not even have to reach the question of full First Amendment speech. But it is very important, even if you look at Bolger, to realize in that case in Discovery Network two commercial speech standard cases that the court went out of its way to talk about the impact on that non-commercial component. And it is simply nonsense to say that in Bolger there was no finding that the purpose of the publication was to sell. Justice Marshall pointed out right away that it was admitted that even that publication, one of the three pamphlets, was intended to be an advertisement by the Young's people for condoms. Clearly, it was intended, no matter how much non-commercial speech was put in there by the person selling the specific item doing the advertising, it was connected. An excellent point, I think, which explains why you're a judge and I'm not, in terms of the expressive content being connected directly to the advertising in that situation. Justice Stevens, who wrote Discovery Network, wrote a concurring opinion in Bolger pointing out that you can't inadvertently affect the non-commercial content and you have to be very careful about that. His view of commercial speech has gained strength in the Supreme Court even since he left the bench. The most recent cases applying commercial speech, as we pointed out, like the Schwarzenegger case from this Court, the Brown v. Video Game case, the Sorrells case from last year, the Court has realized that truthful information, even if it's commercially motivated, is part of the First Amendment. And it has suggested, as Justice Stevens did in the 44 Liquor Mart case, that truthful information about lawful activities, even for commercial purposes, should get First Amendment protection. This case ---- Scalia. They do. We've got to keep in mind that we're talking about First Amendment protection here. It's just how much. Horwich.  And our position, I think, is that it should be full First Amendment protection because you cannot fit this case into the Bolger case, which invalidated what happened, or in Fox, which remanded to look at the overbreadth impact on non-commercial speech. But even if you could force it into the commercial speech standard, you still have to apply that standard in a truly intermediate way and be sensitive to the impact on non-commercial speech, which simply did not happen in this case. Is there, in your view, are there, in your view, any ---- This is on an appeal from a summary judgment. Are there any relevant factual disputes, depending upon what standard is applied, that remain, that should not have gone by way of summary judgment? I don't believe so because the city had the burden to justify. And the city simply didn't satisfy that burden. Just coming in and saying, we heard a lot of complaints, when they couldn't show that those complaints were actually valid complaints or that they were such a significant number of complaints that it caused a perceptible effect on the recycling stream, they didn't satisfy their burden. Had they come forward with that, maybe there would be disputed facts that should require a trial. But they haven't done that. They did not do that. And, fortunately, I don't think they're even trying to move forward on the privacy rationale, which simply makes no sense in this case where you stop at the point where they did not introduce evidence that my clients intentionally violated people's privacy or had any incentive to. We have an incentive to save the $2 to $4 from each book if people really don't want it. Well, but the people delivering may not have an incentive to save. And your clients are selling advertising to people that like the idea that lots of people are going to have the advertising in their homes. So that, although I understand there's a savings if you don't publish books, there's also a reduction in revenue because you don't have as many – you don't have the same circulation. So there's an incentive, but it's not the same as the city's. And I admit this isn't in the record, but people do check up on it and do find how many people actually don't keep the books, and the advertisers do factor that in. Thank you, Your Honor. Thank you, both counsel, for your helpful arguments. The case just argued is submitted. We return.
judges: Korman, Clifton, Smith